Strafford
No. 2008-308

THE STATE OF NEW HAMPSHIRE

v.

GARY DODDS

Argued: May 14, 2009
Opinion Issued: August 21, 2009

*Kelly A. Ayotte*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Getman, Stacey, Schulthess & Steere, P.A.*, of Bedford (*Andrew R. Schulman* on the brief and orally), for the defendant.

BRODERICK, C.J. The defendant, Gary Dodds, appeals his convictions following a jury trial in Superior Court (*Fauver*, J.) for false public alarms, *see* RSA 644:3, I (2007), falsifying physical evidence, *see* RSA 641:6, I (2007), and conduct after an accident, *see* RSA 264:25, I (2004). We affirm.

I

The record supports the following facts. On April 5, 2006, the defendant, who was a candidate in the Democratic primary for the United States House of Representatives, was traveling southbound on Route 16 between Dover and Portsmouth in a snowstorm. Shortly after 8 p.m., a woman driving behind him observed his car swerve left and right and then veer off the road. At the point where his car left the road, she noticed that the guardrail was bent and that the defendant's car was on the far side of it. She drove her car onto the shoulder, stopped and dialed 911.

A short distance west of where the accident occurred, an adjacent roadway, Spur Road, runs parallel to Route 16. To the west of Spur Road lies the Bellamy River. Caren Peloso, who lives on Spur Road, heard the sound of the crash and went out to her driveway to investigate. When she observed the headlights of the defendant's car, she ran back into her house and dialed 911. She then walked through a brushy area to the accident

scene. When she reached the defendant's car, she noticed that its interior light was on, that its passenger side window was down, and that its airbags had deployed. No one was inside the car. Peloso then approached the witness's car and asked her whether she knew the whereabouts of the driver. She did not.

Emergency personnel and firefighters soon arrived at the scene. They unsuccessfully searched the area for the driver of the vehicle. After determining that the car belonged to the defendant, the police called his wife and she came to the scene. She reported that the defendant was supposed to have been on his way to a campaign-related meeting in Somersworth.

The defendant's whereabouts remained a mystery for nearly twenty-seven hours, and his disappearance was the subject of extensive news coverage. Family, friends, emergency personnel and other state and federal officials searched for him on land, by boat on the Bellamy River, and by helicopter. He was eventually found by a search and rescue volunteer in a wooded area west of the Bellamy River, less than a mile from the accident scene, approximately 550 feet from the Garrison School. When he was found, the defendant was awake and knew who and where he was, but not what day it was. He was wearing casual business attire, including a button down shirt, khakis and a fleece pullover. He had on dress socks and one shoe, which were very wet. His oral temperature, taken in the ambulance about fifty minutes after he was found, was 96.8 but later dropped to 96.4 degrees. His face was gray and his feet were discolored, swollen and cold to the touch.

Route 16, also known as the Spaulding Turnpike, is a toll road. The defendant had an EZ pass transponder in his vehicle that automatically paid his toll when he passed through the toll plaza. The defendant's EZ pass records reflect that his car passed through the Dover toll plaza southbound at 7:39 p.m. on the night of the accident. However, the accident occurred north of the toll plaza approximately one half hour later, as the defendant was again driving southbound on the stretch of Route 16 he had already traversed. He could not recall why he backtracked northbound on a non-toll road and then headed south again.

The defendant claimed to have little memory either of the accident or the events leading up to it. He recalled that his car swerved and crashed, and that he left the scene because he smelled smoke and thought his car was on fire. He recalled swimming across a river, walking for a long time, following a power line up a steep hill, becoming exhausted and collapsing. He did not recall the details of what he was doing or where he was going immediately before his car swerved off of the road.

The defendant was initially charged with one count of false public alarms and one count of conduct after an accident. He was later indicted on one count of falsifying physical evidence. He filed a motion *in limine* to exclude a portion of the expert testimony of one of his treating neurologists, whom both he and the State had included on their witness lists, arguing that some of her opinions were not timely disclosed to him. *See* SUPER. CT. R. 98 (C)(1). Following a hearing, the trial court denied the motion in part. The State successfully moved to preclude the defendant from introducing computer animation evidence purportedly depicting the accident. After a sixteen-day jury trial, the defendant was convicted on all charges. This appeal followed. The defendant argues that: (1) his conduct did not fall within the meaning of the false public alarms statute or the falsifying physical evidence statute; (2) no reasonable jury could have found him guilty of any of the charges; (3) the trial court should have excluded the expert opinion of his treating neurologist; and (4) the trial court should have admitted the computer animation of the accident.

## II

The defendant first contends that his conduct did not fall within the meaning of the false public alarms statute or the falsifying physical evidence statute. The false public alarms statute provides: "Any person who directly or indirectly *communicates* to any governmental agency that commonly deals with emergencies involving danger to life or property a *report* known by him to be false regarding a[n] . . . emergency, shall be guilty of a misdemeanor . . . ." RSA 644:3, I (emphases added). With respect to this charge, he argues that he "is not guilty of false public alarm because he never made any sort of 'communication' and never 'reported' an emergency." The falsifying physical evidence statute provides: "A person commits a class B felony if, believing that an official proceeding . . . or investigation is pending or about to be instituted, he . . . [a]lters, destroys, conceals or removes any thing with a purpose to impair its verity or availability in such proceeding or investigation . . . ." RSA 641:6, I. With respect to this charge, the defendant argues that he "is not guilty of falsifying physical evidence by injuring his feet because [they] were not anything that could be used in a proceeding or investigation." (Quotation omitted.)

The State asserts that these arguments have not been preserved for our review. We agree. The defendant's arguments on appeal concern interpretations of RSA 644:3, I, and RSA 641:6, I, whereas in the trial court he asserted only that the evidence was insufficient to support a conviction. Indeed, the defendant concedes that these arguments may have been "imperfectly preserved" because they "were couched in general terms" in

his motions to dismiss and he "did *not* specifically address the State's failure to prove either a 'report' or a 'communication.' " "[P]reservation of an issue for appeal requires a contemporaneous and specific objection." *State v. Ryan*, 135 N.H. 587, 588 (1992). "Any objection not raised at trial is deemed waived." *Id.* By his own admission, the defendant did not raise at trial the statutory interpretation arguments he now advances; thus they are deemed waived.

■ The defendant nonetheless argues that we ought to review these issues under the plain error rule. *See* SUP. CT. R. 16-A. The plain error rule allows us to consider errors either not brought to the attention of the trial court or not raised in the notice of appeal. The rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result. Thus, to fall within the plain error rule: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. *State v. Lamy*, 158 N.H. 511, 524 (2009).

Under the first prong of plain error review, "there must be an error." This requires us to examine the trial court's interpretation of the false public alarms statute and the falsifying physical evidence statute, which we review *de novo. Id.* at 515. In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *State v. Formella*, 158 N.H. 114, 116 (2008). When interpreting statutes, we look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *State v. Duran*, 158 N.H. 146, 155 (2008). We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. *See* RSA 625:3 (2007). We will neither consider what the legislature might have said nor add words that it did not see fit to include. *Duran*, 158 N.H. at 155. Absent an ambiguity, we will not look beyond the language of the statute to discern legislative intent. *Formella*, 158 N.H. at 116.

■ To be guilty of false public alarms, a defendant must (1) directly or indirectly communicate to a governmental agency (2) a report of an emergency (3) known by him to be false. *See* RSA 644:3, I. The defendant does not dispute that the police constitute a governmental agency within the meaning of the statute, and it is undisputed that he did not directly report an emergency. Accordingly, we are concerned only with whether the defendant indirectly communicated a report of an emergency that he knew was false.

The plain and ordinary meaning of "indirectly" includes "not directly aimed at or achieved . . . : not resulting directly from an action or cause." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1151 (unabridged ed. 2002). "Communicate" means, among other things, "to make known." *Id.* at 460. A "report" includes "something that gives information . . . : NOTIFICATION." *Id.* at 1925. We find that these terms are not ambiguous, and that they are sufficiently broad to include the conduct at issue in this case. The plain meaning of these terms does not require that an indirect communication occur solely by spoken word from the mouth of the defendant. To the contrary, a defendant could make known or "communicate" an emergency through his conduct — in this case, by evading search and rescue. The statute proscribes communicative conduct that indirectly causes a "report" of an emergency that the defendant knows is false, as was the case here.

The defendant was convicted of "failing to return from an undisclosed location and failing to communicate his location thereby evading search and rescue personnel," after having been in an automobile accident, and of doing so knowingly. Conviction for this conduct was not inconsistent with our interpretation of the false public alarms statute and did not constitute an error of law under the plain meaning of its terms. The acts of failing to return from an undisclosed location, evading search and rescue personnel and of doing so knowingly constitute conduct that "indirectly communicates" a report of an emergency based upon the plain meanings of those terms.

We next address the charge of falsifying physical evidence. To be guilty of falsifying physical evidence, a defendant must (1) alter any thing (2) with a purpose of impairing its verity or availability for an official proceeding or investigation (3) believing that an official proceeding or investigation is pending or about to be instituted. *See* RSA 641:6, I. The defendant essentially argues that because uninjured feet would likely not have been relevant to an investigation, altering his feet did not transform them into something relevant. He does not dispute that he knew a proceeding or investigation was pending at the time his feet were altered.

We disagree that, under the circumstances of this case, the defendant's uninjured feet would not have been relevant to an investigation. Because the defendant claimed he did not recall much of what happened after the accident, any injury or absence thereof would have been relevant to officials trying to reconstruct what had occurred. This conclusion is supported by our decision that RSA 641:6, I, does not require that the evidence falsified be admissible at trial. *See State v. McGurk*, 157 N.H. 765,

770 (2008). The falsifying physical evidence statute simply "requires the State to prove that the defendant, believing that there was a proceeding pending, knowingly altered, destroyed, concealed or removed anything, and did so with a purpose to impair its availability." *Id.* at 773. To be guilty here, the State needed to prove that the defendant altered "any thing with a purpose to impair its verity or availability in [an official] proceeding or investigation." RSA 641:6, I. Having determined there was no error in the trial court's interpretation of the statutes, we need not examine the remaining prongs of the plain error analysis.

### III

Next, the defendant challenges the sufficiency of the evidence.

> To prevail upon his challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt. When the evidence is solely circumstantial, it must exclude all rational conclusions except guilt. Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation.

*State v. Breed*, 159 N.H. 61, 65-66 (2009) (citations omitted).

We first consider the charge of false public alarms. A rational juror could have found that the defendant failed to return from an undisclosed location and failed to communicate his location, thereby evading search and rescue personnel. A rational juror could also have found that he did this knowingly, even though he testified that he hit his head and did not remember much of what happened. Credibility determinations are best left to jurors. *See id.* at 67.

The State presented testimony from medical professionals who treated the defendant that cast doubt upon the nature of his claimed memory loss. In particular, a neurologist, Dr. Karen Lauze, examined the defendant in the hospital the day after he was found. She concluded that he had not suffered any brain injury, but that he had a moderate closed head injury in the form of a bump with swelling. She asked the defendant to describe his memory of the accident. Based upon his responses, she testified that his pattern of memory was "unusual" if he indeed suffered a head injury significant enough to make him wander off from the scene of the accident. She also opined that because the paramedic who treated the defendant at the scene did not observe any signs of a head injury, the bump to his head

may not have occurred when the accident occurred. Notes from emergency room personnel who treated the defendant upon his arrival at the hospital indicated that he did not suffer any brain trauma.

The defendant's own witness, one of his treating physicians, testified that a core body temperature below 95 degrees would constitute mild hypothermia. Shortly after the defendant was found, his oral temperature was above 95 degrees. The State presented expert testimony that oral temperatures often read colder than the more accurate rectal temperature. A reasonable inference to be drawn from this evidence when taken in the light most favorable to the State is that the defendant did not suffer from hypothermia, which would permit a jury to doubt his version of events and conclude that he evaded search and rescue. Although the defendant presented his own experts and treating physicians who in some cases contradicted evidence presented by the State, "[a]s the trier of fact, the jury was in the best position to measure the persuasiveness and credibility of evidence and was not compelled to believe even uncontroverted evidence." *Id.*

In arguing that the evidence was insufficient to convict him of the false public alarms offense, the defendant examines each piece of evidence in isolation and characterizes it as "loose ends," "rank speculation," or "more consistent with innocence than guilt." When addressing a sufficiency of the evidence argument, however, we view the evidence in context. *See id.* Any conflicts in the evidence were for the jury to resolve. *See id.* Based upon the record before us, we cannot say that no rational juror could have found the defendant guilty beyond a reasonable doubt of false public alarms.

We next consider the sufficiency of the evidence supporting the defendant's conviction for falsifying physical evidence. In presenting this argument, the defendant mischaracterizes the State's burden as having to prove that he "(a) went from the west bank of the river to safety, (b) soaked his feet in cold water while he was in a warm room and then (c) surreptitiously re-inserted himself *in a place in the woods where no one would be looking for him.*" However, the State needed to prove only that the defendant altered the appearance of his feet to make them appear consistent with his statement of events with a purpose to impair their verity or availability in a proceeding or investigation. *See* RSA 641:6, I.

A rational juror could have found that after being involved in an accident, the defendant altered the appearance of his feet to make them appear consistent with his statement of events, including his claim that he crossed the Bellamy River and remained outside exposed to the elements. A rational juror could also have found that he did this with a purpose to impair their verity or availability in a proceeding or investigation.

The State presented testimony from a cold injury expert, Dr. Murray Hamlet, a retired Director of Medical Research for the United States Army. Dr. Hamlet testified that it would have been possible for the defendant to have injured his feet intentionally by soaking them in cold water. He further testified that the injury to the defendant's feet was not frostbite, but an injury caused by prolonged immersion in cold water. Based upon review of the defendant's medical records, knowledge of the weather conditions and the clothing the defendant was wearing while he was missing, Dr. Hamlet opined that the injury to the defendant's feet was caused by immersing them in water for between one and ten hours, depending upon the water temperature. The State also presented testimony from multiple witnesses who treated the defendant at the scene where he was found and at the hospital and documented his condition as potentially inconsistent with his version of events. Although the defendant presented testimony from his treating physician that the condition of his feet was consistent with his account of crossing the river and spending a night in the woods, this presented an issue of fact for the jury to resolve. *See Breed*, 159 N.H. at 67. Based upon the record before us, we cannot say that no rational juror could have found the defendant guilty beyond a reasonable doubt of falsifying physical evidence.

■■■ The defendant makes no argument specifically challenging the sufficiency of the evidence supporting his conviction for conduct after an accident. Therefore, we deem this issue waived. *See State v. Hofland*, 151 N.H. 322, 327 (2004) ("All issues raised in the defendant's notice of appeal but not briefed are deemed waived.").

## IV

The defendant next argues that the trial court erred in partially denying his motion *in limine* to exclude expert testimony from Dr. Lauze. He argues that her expert opinions were not timely disclosed, causing him prejudice. Superior Court Rule 98(C)(1) provides, in relevant part: "Not less than twenty (20) calendar days prior to jury selection . . . the state shall provide the defendant with . . . all statements of witnesses the state anticipates calling at the trial . . . ." SUPER. CT. R. 98(C)(1). Under the rule, the State must also "state a summary of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." *Id.*

"We will not reverse the trial court's admission of evidence absent an unsustainable exercise of discretion." *State v. Gamester*, 149 N.H. 475, 478 (2003). "This same standard applies to review of the trial court's decision with respect to alleged discovery violations." *Id.* "To show that the trial court's exercise of discretion is unsustainable, the defendant must show

that the decision was clearly unreasonable to the prejudice of his case." *Id.* "Actual prejudice exists if the defense has been impeded to a significant degree by the nondisclosure." *State v. Stickney*, 148 N.H. 232, 236 (2002).

Both parties included Dr. Lauze on their witness lists as someone who would testify regarding what she observed and memorialized in her reports, but seven days before the start of trial, the State received an unsolicited letter from her. In the letter, Dr. Lauze described several inconsistencies in the medical reports from the various medical professionals who had examined the defendant shortly after he was found. Her letter indicated that she believed that the defendant had fabricated his memory loss and the cause of his injuries. The following day, the State gave the letter to the defendant, and he moved to exclude the expert opinions it contained based upon the late disclosure. The trial court denied the motion in part, ruling:

> Dr. Lauze can testify as an expert as to her experience as a medical professional and to her practice of reading and interpreting medical records. Dr. Lauze can further testify as to the signs and symptoms of exposure and her testimony regarding the symptoms that the defendant presented. Dr. Lauze may also testify, provided the State lays the proper foundation, to the signs and symptoms of a head injury and testify to the injuries that the defendant presented. Dr. Lauze may also give her ultimate medical diagnosis regarding the defendant's head injury. Dr. Lauze, however, cannot testify to an ultimate conclusion regarding whether the defendant was or was not faking his exposure to the cold.

The defendant argues that the State's late disclosure of Dr. Lauze's expert testimony caused him prejudice because he did not have time to depose her, to retain his own expert or to prepare his cross-examination adequately. We disagree. Assuming, without deciding, that the State's disclosure of Dr. Lauze's unsolicited letter six days prior to trial failed to comply with Rule 98(C)(1), the defendant has failed to carry his burden of proving that the trial court's admission of the testimony caused him prejudice. The State's disclosure of Dr. Lauze's January 21, 2008 letter occurred on January 22, and the defendant did not rest his case until February 15, 2008. He did not ask the court for time to depose her. Moreover, he was aware that Dr. Lauze had examined him and he listed her as one of his own witnesses for trial. Dr. Lauze did not testify until February 1, and the defendant had the opportunity to cross-examine her. In addition, the defendant called three doctors who testified that his injuries were consistent with his version of what transpired. Accordingly,

he has failed to show that he suffered prejudice or that his defense was impeded to a significant degree, and the trial court did not commit an unsustainable exercise of discretion by allowing her testimony.

## V

Finally, the defendant argues that the trial court should have admitted a computer animation purporting to depict how the accident occurred to illustrate the testimony of his traffic reconstruction expert. Outside the presence of the jury, the trial court held a hearing on whether to admit the computer animation. Daniel Donovan, the accident reconstruction expert who created the script upon which the animation was based, and Mark Dole, the computer animator, both testified. The trial court found that "[n]o evidence was offered to specifically substantiate the[] facts and figures" Dole and Donovan used in creating the animation, and that "Donovan never saw the vehicle first hand, never spoke with anyone who was at the accident scene other than the defendant, and does not know how the damage to the vehicle occurred." The trial court ruled that "the defendant ha[d] failed to meet his burden to prove that Mr. Donovan's script, and therefore the animation, [was] a fair and accurate representation of the accident." Accordingly, the trial court excluded the computer animation under New Hampshire Rules of Evidence 901 and 403.

The defendant argues that "[t]he trial court erred by requiring a greater degree of scientific foundation for an animated chalk than for the underlying expert opinion." We interpret this argument to mean that the computer animation was sufficiently authenticated as required by Rule 901(a). He further asserts: "That [the animation] might impress upon the jury the meaning of the expert's testimony does not make it unduly prejudicial." We interpret this argument to mean that the trial court erred in precluding the animation because it had probative value even without "evidence . . . to specifically substantiate the[] facts and figures" and that its probative value was not substantially outweighed by the danger of unfair prejudice to the State.

Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We defer to the trial court in determining admissibility of evidence absent an unsustainable exercise of discretion. *See State v. Legere,* 157 N.H. 746, 758 (2008), *cert. denied,* 129 S. Ct. 1623 (2009). We

will not reverse the trial court's evidentiary ruling unless the defendant can demonstrate that it "was clearly untenable or unreasonable to the prejudice of his case." *Id.*

The defendant does not argue that the computer animation was anything other than an illustration of Donovan's expert testimony. At trial, he presented diagrams drawn by Donovan depicting what Donovan believed occurred during the accident. Upon direct and cross-examination, Donovan explained the diagrams and the basis for his opinions and conclusions to the jury. Thus, the computer animation would not have provided the jury with any evidence not already provided by the diagrams and testimony. Therefore, we conclude that the defendant has failed to carry his burden of proving that excluding it prejudiced him under the facts of this case. *See id.* Accordingly, we cannot say that the trial court unsustainably exercised its discretion by granting the State's motion to exclude the animation.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.