Rockingham
No. 2010-130

THE STATE OF NEW HAMPSHIRE

v.

ANDRE RIVERA

Argued: April 7, 2011
Opinion Issued: June 28, 2011

*Michael A. Delaney*, attorney general (*Ann M. Rice*, associate attorney general, on the brief and orally), for the State.

*Stephanie Hausman*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, J. Following a jury trial in Superior Court (*Nicolosi*, J.), the defendant, Andre Rivera, was convicted of accomplice to reckless second-degree murder, *see* RSA 626:8 (2007); RSA 630:1-b, I(b) (2007). He appeals his conviction, arguing that the trial court: (1) erred in refusing to dismiss the indictment; and (2) provided erroneous instructions to the jury. We affirm.

The jury could have found the following facts. In August 2007, the defendant, Christopher Gagne, Troy Whipple, Ryan Mead, and Jordan Webster discussed committing a robbery. Gagne had a Mac 11 submachine gun, which he had stolen a few days earlier. The defendant suggested robbing Jason Violette, whom the defendant knew to be a drug dealer, of money and drugs. The others agreed to this plan. Whipple told the others that Violette had a gun, which he normally kept in a safe. The group decided that Gagne would bring his gun to subdue Violette while the others searched the house. In discussing the possibility of an armed standoff with Violette, Gagne stated, "If it's him [Violette] or me, it's him." The defendant replied, "Do what you got to do." Whipple called Violette to arrange to buy drugs from him.

On the night of August 12, 2007, the defendant, Gagne, Webster, Whipple and Mead met at Gagne's brother's house. The defendant drove the others to Mead's father's house to change cars for the robbery, then to a wooded hiding place to collect Gagne's gun, and then to Violette's house. Whipple and Mead waited outside while Webster, Gagne, and the defendant entered through a side door. They found Violette upstairs in the kitchen. Gagne ordered him to turn around and "give [them] his things, his stuff." The defendant began punching Violette, who fought back. Gagne noticed that

Violette had a gun in his pocket and shouted this information to his companions. Webster and the defendant promptly ran downstairs. Gagne and Violette struggled. Gagne testified that when Violette pulled out his gun, Gagne shot him. Gagne then ran downstairs. The defendant and Webster were in the basement, and the defendant was looking through a dresser drawer. Gagne told the others that he had shot Violette, after which Gagne, Webster, and the defendant left the house, ran back to the car, and left with Whipple and Mead.

The defendant was subsequently indicted on charges of reckless second-degree murder under an "accomplice in conduct" theory, as well as conspiracy to commit burglary, and burglary. He was found guilty by a jury on all three charges.

Prior to trial, the defendant moved to dismiss the murder indictment on the grounds that it failed to allege that he acted with the purpose to promote or facilitate the specific *actus reus* of the principal offense — Gagne's shooting the gun, which caused Violette's death. The trial court denied the motion, and at trial, also denied the defendant's request for a jury instruction that would have required the jury to find he acted with such purpose in order to find him guilty of the murder charge. On appeal, the defendant challenges both rulings.

The interpretation of a statute is a question of law, which we review *de novo. State v. Dodds*, 159 N.H. 239, 244 (2009). "In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole." *Id.* We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. *See* RSA 625:3 (2007). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Dodds*, 159 N.H. at 244. Further, we interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language it did not see fit to include. *State v. Hynes*, 159 N.H. 187, 193 (2009), *cert. denied*, 130 S. Ct. 1083 (2010). Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.*

Our accomplice statute, RSA 626:8, was based upon section 2.06 of the Model Penal Code. *See* COMMISSION TO RECOMMEND CODIFICATION OF CRIMINAL LAWS, REPORT OF COMMISSION TO RECOMMEND CODIFICATION OF CRIMINAL LAWS § 571:8 cmts. at 17 (1969). It provides, in relevant part:

> III. A person is an accomplice of another person in the commission of an offense if:

(a) With the purpose of promoting or facilitating the commission of the offense, he solicits such other person in committing it, or aids or agrees or attempts to aid such other person in planning or committing it . . . .

IV. *Notwithstanding the requirement of a purpose as set forth in paragraph III(a),* when causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense. In other words, to establish accomplice liability under this section, it shall not be necessary that the accomplice act with a purpose to promote or facilitate the offense. *An accomplice in conduct can be found criminally liable for causing a prohibited result, provided the result was a reasonably foreseeable consequence of the conduct and the accomplice acted purposely, knowingly, recklessly, or negligently with respect to that result, as required for the commission of the offense.*

RSA 626:8 (emphasis added). We look to the Model Penal Code commentaries for guidance. *See State v. Lamy,* 158 N.H. 511, 515 (2009). As discussed by the Model Penal Code commentaries, the language of RSA 626:8, IV, most commonly pertains to situations "where *unanticipated* results occur from conduct for which the actor is responsible . . . ." MODEL PENAL CODE AND COMMENTARIES § 2.06 cmt. 7, at 321 (1985) (emphasis added). The commentaries describe the relevance of RSA 626:8, IV to homicide prosecutions:

A manslaughter prosecution could be brought on the theory that the defendant consciously disregarded a substantial risk that death would result from the assisted conduct, the risk being of such a nature and degree that, considering the nature and purpose of the defendant's conduct and the circumstances known to him, its disregard involved a gross deviation from the standard of conduct that a law-abiding person would have observed in the defendant's situation. A murder prosecution could be brought on the theory that the defendant was reckless as described, and moreover that he was reckless under circumstances manifesting extreme indifference to the value of human life. . . . [T]he presumption that the requisite recklessness and indifference to make out a case of murder exist is afforded by the fact that the actor is an accomplice in the commission of [a] robbery.

*Id.* cmt. 7, at 321 n.70 (quotations, ellipses, and citations omitted).

[1] We have interpreted RSA 626:8, III and IV to require that the State prove that the accomplice (a) "intended to promote or facilitate another's unlawful or dangerous *conduct*," and (b) "acted with the culpable mental state specified in the underlying statute with respect to the result." *State v. Anthony*, 151 N.H. 492, 495 (2004) (quotations omitted). Here, the statute underlying the defendant's accomplice-in-conduct charge was the second-degree murder statute, RSA 630:1-b (2007). With respect to the mental state required for second-degree murder, the statute provides, in relevant part,

> I. A person is guilty of murder in the second degree if:
>
>     . . .
>
>     (b) He causes such death recklessly under circumstances manifesting an extreme indifference to the value of human life. Such recklessness and indifference are *presumed* if the actor causes the death by the use of a deadly weapon in the commission of, or in an attempt to commit, or in immediate flight after committing or attempting to commit any class A felony.

RSA 630:1-b, I (emphasis added). RSA 635:1, I and II (2007) provide that burglary is a class A felony when perpetrated in the dwelling of another at night or if the actor is armed with a deadly weapon.

The defendant argues that, in order to prove second-degree murder, the State was required to prove that he aided and had the purpose to promote the conduct that directly resulted in Violette's death, *i.e.*, the shooting.

We believe the defendant's reading of the statute is contradicted by the language of RSA 626:8, IV. Paragraph IV plainly states that accomplice liability can flow from conduct "provided the result was a *reasonably foreseeable consequence* of the conduct." RSA 626:8, IV (emphasis added). To require the State to prove that the defendant had a purpose to promote or facilitate the *actus reus* of a prohibited results crime would limit accomplice liability to only the *direct*, not the "reasonably foreseeable," consequences of the defendant's conduct. We agree with the State that Violette's death was a reasonably foreseeable consequence of the defendant's actions in planning an armed burglary of a house occupied by a person he knew to have a gun; driving his companions, one of whom he knew was armed with a gun, to Violette's home; entering the home with his companions; confronting and scuffling with the victim; and searching the victim's property while Gagne, armed with a gun, remained with the victim.

■The defendant points to the following language in *Anthony* to support his argument: "[T]he standard interpretation of the phrase 'intent to promote or facilitate the commission of the offense' is that it requires proof of the accomplice's intent to promote or facilitate another person's *conduct* that constitutes the *actus reus* of the offense." *Anthony*, 151 N.H. at 494 (quotation omitted). This passage addresses RSA 626:8, III alone. *Id.* However, when causing a prohibited result is an element of an offense, paragraph IV modifies the formulation stated in paragraph III. *See* RSA 626:8, IV ("Notwithstanding the requirement of a purpose as set forth in paragraph III(a), when causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense . . . ."). Paragraph IV specifically provides that, in such a case, "it shall *not* be necessary that the accomplice act with a purpose to promote or facilitate the *offense*." (Emphasis added.)

■We also disagree with the defendant's reliance on *State v. Locke*, 144 N.H. 348, 352 (1999) ("Section III . . . sets forth the elements which must be present above, beyond, and regardless of the substantive offense." (quotation omitted)), and the plurality opinion in *State v. Etzweiler*, 125 N.H. 57, 65 (1984) ("[U]nder our statute, the accomplice must aid the primary actor in the substantive offense with the purpose of facilitating the substantive offense."). These cases are inapplicable to the question at hand because both dealt with an earlier version of RSA 626:8. *Compare* RSA 626:8, IV (1974) *and* RSA 626:8, IV (2007). Our interpretations of the earlier versions of RSA 626:8 were superseded by legislative amendments to the statute in 2001, which clarified that "[n]otwithstanding the requirement of a purpose as set forth in paragraph III(a)," in the case of a prohibited results crime such as murder, the accomplice need not have acted with a purpose to promote or facilitate that result in order for the State to establish criminal liability for the crime if the result was a reasonably foreseeable consequence of the accomplice's actions. RSA 626:8, IV (2007); *see Anthony*, 151 N.H. at 494 ("We read the 2001 amendment to RSA 626:8 as a legislative rejection of the interpretation of that statute stated by the plurality in *Etzweiler* and reiterated by the court in *Locke*.").

■We disagree with the defendant's assertions that our accomplice-in-conduct formulation is indistinguishable from a felony murder scheme. "The classic formulation of the felony-murder doctrine declares that one is guilty of murder if a death results from conduct during the commission or attempted commission of any felony. . . . As thus conceived, the rule operated without separate proof of any culpability with regard to the death." MODEL PENAL CODE § 210.2 cmt. 6, at 30-31 (1980). Our statutory scheme does not allow imposition of guilt regardless of the actor's mental

state, but requires that the State prove that the defendant possessed the mental state required by the underlying offense — in this case, recklessness. *See* RSA 626:8, IV; RSA 630:1-b, I(b).

The defendant further argues that the indictment and jury instructions "referred the jury to the wrong conduct and the wrong substantive offense," essentially charging him only with promoting or facilitating an armed burglary, not promoting or facilitating second-degree murder. The indictment alleged that:

> Andre Rivera . . . did commit the crime of [s]econd [d]egree [m]urder . . . in that Andre Rivera, acting in concert with and aiding Christopher Gagne, recklessly caused the death of Jason Violette under circumstances manifesting an extreme indifference to the value of human life. With the purpose of promoting or facilitating the burglary of the dwelling of another at night with a deadly weapon as defined in RSA 635:1, by Christopher Gagne and/or Jordan Webster, Andre Rivera acted in concert with and aided Christopher Gagne and/or Jordan Webster in such burglary by entering Jason Violette's home with them with the purpose to commit theft therein. In the commission of such burglary, Christopher Gagne caused the death of Jason Violette by shooting him with a gun in the chest.

The jury was instructed in accordance with the indictment.

In response, the State contends that the indictment and the jury instructions recited the elements of accomplice to second-degree murder, as the defendant's facilitation of the armed burglary of Violette's home satisfied the State's burden, articulated in *Anthony*, to show that the defendant "acted with the culpable mental state specified in the underlying statute with respect to the result." *Anthony*, 151 N.H. at 495. We agree.

■■ As the defendant concedes, there is a statutory presumption that participation in an armed burglary, a class A felony, is proof that the defendant acted recklessly with extreme indifference to the value of human life. *See* RSA 630:1-b. The defendant appears to argue that, at trial, the State wrongly relied on this presumption to show causation, rather than to show the defendant's mental state. The transcript does not support this interpretation. The court instructed the jury, "You *may* presume that a person acted *recklessly* with extreme indifference to the value of human life required for the crime of second-degree murder if you find that a person used a deadly weapon while committing or attempting to commit a class A felony." (Emphasis added.) This instruction made clear that the presumption applied to the *mens rea*, not the *actus reus*, of the crime of murder.

Further, the State asserts, and we agree, that the evidence was sufficient for a jury to find beyond a reasonable doubt, even without the operation of the presumption, that the defendant acted recklessly with extreme indifference to human life. The defendant entered Violette's home at night with two other men, one of whom he knew carried a loaded gun, with the intention of stealing money and drugs; the men had agreed that Gagne would hold Violette at gun point while the defendant and Webster searched the house; the defendant was also aware that Violette might be armed and had discussed the possibility that Gagne would shoot Violette if there was a stand-off.

Accordingly, we conclude that the trial court did not err in denying the motion to dismiss and in instructing the jury as it did.

*Affirmed.*

DALIANIS, C.J., and DUGGAN, HICKS and CONBOY, JJ., concurred.