Hillsborough-northern judicial district
No. 2011-144

ROBERT PELKEY

v.

DAN'S CITY USED CARS, INC. d/b/a DAN'S CITY AUTO BODY

Argued: February 9, 2012
Opinion Issued: April 10, 2012

*Kazan, Shaughnessy, Kasten & McDonald, PLLC*, of Manchester (*Brian C. Shaughnessy* on the brief and orally), for the plaintiff.

*Downs Rachlin Martin PLLC*, of Lebanon (*Kate Strickland* on the brief and orally), for the defendant.

LYNN, J. The plaintiff, Robert Pelkey, appeals the decision of the Superior Court (*Garfunkel*, J.) granting the motion for partial summary judgment of the defendant, Dan's City Used Cars, Inc. d/b/a Dan's City Auto Body. We reverse and remand.

*I. Background*

The following facts are drawn from the record. In March 2009, the plaintiff brought suit against both his landlord, Colonial Village, and the defendant. In his writ, the plaintiff alleged that the defendant towed his 2004 Honda Civic pursuant to a parking policy at Colonial Village requiring tenants to move their cars during snowstorms. At the time, the plaintiff was confined to bed due to a serious medical condition and did not realize that his car had been towed. Soon thereafter, he was admitted to the hospital for a procedure to amputate his left foot, during which he suffered a heart attack. After returning home and learning that his car was missing, he had his attorney make inquiries into its location. His attorney learned that the defendant had possession of the car and had scheduled it to be sold at a public auction two days later. After the attorney informed the defendant that his client wished to arrange for the return of his vehicle, the defendant falsely told the attorney that the car had been sold at public auction. The defendant later traded the car to a third party, but the plaintiff received no remuneration for his loss.

The plaintiff brought this lawsuit in 2009, alleging that the defendant violated: (1) the Consumer Protection Act, *see* RSA 358-A:2 (2009); (2) RSA chapter 262, a statute permitting a towing company to place a lien on a vehicle for reasonable charges incident to towing and storage and prescribing the requirements for collection of those charges by selling the vehicle at auction; and (3) the common law duty of a bailee to exercise reasonable care while in possession of a bailor's property. The trial court granted the defendant's motion for summary judgment on the grounds that a provision of the Federal Aviation Administration Authorization Act of 1994 (FAAAA), a federal law deregulating the trucking industry, preempted the plaintiff's claims. *See* 49 U.S.C. § 14501(c)(1) (2006). This appeal followed.

*II. Federal Preemption — General Principles*

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RSA 491:8-a, III (2010). In reviewing the trial court's grant of summary judgment, we consider the affidavits and other evidence, and all

inferences properly drawn from them, in the light most favorable to the non-moving party. *Waterfield v. Meredith Corp.*, 161 N.H. 707, 709 (2011). If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. *Id.* The adverse party may not rest upon mere allegations or denials in his pleadings, but his response, by affidavits or by reference to depositions, answers to interrogatories, or admissions, must set forth specific facts showing that there is a genuine issue for trial. RSA 491:8-a, IV (2010). We review the trial court's application of the law to the facts *de novo. Waterfield*, 161 N.H. at 709.

We also review the trial court's statutory interpretation *de novo. State v. Beauchemin*, 161 N.H. 654, 658 (2011). Because the meaning of § 14501(c)(1) is a question of federal law, we interpret it in accordance with federal policy and precedent. *Cf. State v. Buchanan*, 155 N.H. 505, 506 (2007). When interpreting a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Beauchemin*, 161 N.H. at 658. We do not read words or phrases in isolation, but in the context of the entire statutory scheme. *New Hampshire Health Care Assoc. v. Governor*, 161 N.H. 378, 385 (2011).

The Interstate Commerce Act, as amended by the FAAAA, 108 Stat. 1606 (1994), and the ICC Termination Act of 1995, 109 Stat. 899 (1995), preempt states and their subdivisions from enacting or enforcing any law "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Towing companies, as entities that provide "motor vehicle transportation for compensation," 49 U.S.C. § 13102(14) (2006), are motor carriers under the terms of the act. *Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424, 430 (2002). Among the exceptions to the general preemption clause is § 14501(c)(2)(C), which provides that preemption does not apply to the authority of a state to enact or enforce laws relating to the price of towing services if such services are performed without the prior consent of the vehicle's owner.

■ Congress's goal in enacting § 14501(c)(1) and similar provisions affecting the airline and shipping industries was to help "assure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008) (quotations omitted). Its history reflects this free market economic goal. In 1994, over a decade after Congress had deregulated the trucking industry in 1980, *see* Motor Carrier Act of 1980, 94 Stat. 793 (1980), Congress precluded states from regulating

the industry. *See* Federal Aviation Administration Authorization Act of 1994, 108 Stat. 1605-06; ICC Termination Act of 1995, 109 Stat. 899; *see also* 49 U.S.C. § 41713(b)(4)(A) (2006) (similar provision for combined motor-air carriers). In doing so, Congress intended to free motor carriers operating in interstate commerce from unreasonably burdensome state and municipal regulations. *See Ours Garage*, 536 U.S. at 440 (citing H.R. Conf. Rep. No. 103-677, at 87 (1994) and Pub. L. 103-305 § 601(a)(1), 108 Stat. 1605).

■ Two general principles guide courts in the interpretation of express preemption provisions like § 14501(c)(1). "First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all preemption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotations and citations omitted). Second, "analysis of the scope of the statute's pre-emption is guided by [the] oft-repeated comment . . . that the purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (quotations omitted).

■ Federal precedent makes clear that the "relating to" language in § 14501(c)(1) is construed broadly. *Cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992). In *Morales*, the United States Supreme Court held that the Airline Deregulation Act (ADA), a law with a preemption provision similar to § 14501(c)(1),[1] "pre-empts the States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes." *Id.* at 378. Several state attorneys general had developed, and sought to enforce against airlines, advertising guidelines that would satisfy state consumer protection laws. The Court reasoned that the phrase "related to" was "deliberately expansive" and adopted a standard that state actions would be preempted if they had "a connection with, or reference to" airline rates, routes, or services. *Id.* at 384. Under that standard, the states' attempts to impose substantive interpretations of their consumer protection laws upon airline rates constituted precisely the kind of regulation that Congress sought to displace when it deregulated the airline industry and enacted the preemption provision. *See also Rowe*, 552 U.S. at 371-73 (holding that

---

[1] That provision, now codified at 49 U.S.C. § 41713(b) (2006), prohibits states from enacting or enforcing any law "related to a price, route, or service of an air carrier." *See also Rowe*, 552 U.S. at 367-68.

§ 14501(c)(1) preempts two provisions of a Maine law regulating the delivery of tobacco within the state; Maine's attempt to require tobacco retailers to employ only delivery companies that follow particular delivery service procedures created a direct "connection with" motor carrier services — i.e., the transportation and delivery of goods).

Despite the expansive language of § 14501(c)(1), its preemptive reach is not unlimited. As the Supreme Court in *Morales* made clear regarding the ADA, some state actions may affect motor carrier rates, routes, and services "in too tenuous, remote, or peripheral a manner to have preemptive effect." *Morales*, 504 U.S. at 390 (citing gambling and prostitution laws). Moreover, preemption may not apply where an interpretation of § 14501(c)(1) would give a motor carrier "*carte blanche* to lie and to deceive consumers" because Congress likely did not intend such a result. *See id.* at 390-91. While that fear was not present in *Morales* because the United States Department of Transportation retained the power to prohibit unfair pricing and advertising in the airline industry, other courts confronting disputes in this field have reasoned that Congress did not intend to leave private parties without any recourse against the tortious conduct of motor carriers and airlines. *See, e.g., Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1266 (9th Cir. 1998). Courts must take care not to construe preemption provisions more broadly than Congress intended; they must, therefore, "look to the provisions of the whole law, and to its object and policy." *Kelly v. Robinson*, 479 U.S. 36, 43 (1986).

The Supreme Court has had no occasion to decide whether § 14501(c)(1) displaces state laws governing the manner in which a towing company may dispose of a vehicle to collect a debt secured by a lien. Our review of the precedents from other jurisdictions reveals mixed authority on that question. *Compare Ware v. Tow Pro Custom Towing and Hauling*, 289 Fed. App'x 852, 856 (6th Cir. 2008) (holding conversion claims preempted, but declining to address argument under § 14501(c)(2)(C) — the nonconsensual towing exception related to price — because it was raised for first time on appeal), *Weatherspoon v. Tillery Body Shop, Inc.*, 44 So. 3d 447, 458 (Ala. 2010) (holding preempted claims such as failure to investigate the identity of a vehicle's owner, improper sale, and failure to comply with state laws governing the notice and sale of abandoned vehicles), *and A.J.'s Wrecker Service of Dallas v. Salazar*, 165 S.W.3d 444, 449 (Tex. Ct. App. 2005) (holding claims based on towing company's allegedly improper towing were preempted), *with Rhode Island Public Towing Ass'n v. State*, No. 96-454ML, 1997 WL 135571 at *8 (D.R.I. Feb. 28, 1997) (regulation of storage rates held not preempted), *and CPF Agency Corp. v. Sevel's 24 Hour*

*Towing Serv.*, 34 Cal. Rptr. 3d 120 (Cal. Ct. App. 2005) (state statute regarding lien-sale-preparation fees held not preempted).

## III. Application of § 14501(c)(1) to Plaintiff's Claims

Against this backdrop, the plaintiff contends that § 14501(c)(1) does not preclude his lawsuit because his writ presses claims that "relate to enforcement of a statutory lien involving the sale of the vehicle to collect money owed, and do not relate to transportation rates, routes, and services of a motor carrier." The defendant, on the other hand, argues that § 14501(c)(1) preempts all of the plaintiff's claims because they "all have a reference to, or a connection with, the towing services provided by Dan's City."

■ We are convinced that § 14501(c)(1) does not preempt state laws pertaining to the manner in which a towing company disposes of vehicles in its custody to collect towing and storage charges secured by a lien. As noted, we start with the presumption that "the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). The Supreme Court in *Morales* noted that preemption occurs at least where state laws have a "significant impact" related to Congress's deregulatory objectives. *Morales*, 504 U.S. at 390. The purpose of enacting the FAAAA was to prevent states from imposing their own regulatory impediments on the trucking industry, thereby creating a patchwork of laws and undermining the operation of the free market. *See Rowe*, 552 U.S. at 371. In light of these principles and the FAAAA's purpose and text, several considerations in this case convince us that, in enacting § 14501(c)(1), Congress did not intend to displace state law causes of action challenging the manner in which custodians of towed vehicles dispose of them to collect towing and storage debts.

### A

■ As an initial matter, the text of § 14501(c)(1) makes clear that preemption does not apply simply because state laws relate to the price, route, or service of a motor carrier *in any capacity*; rather, it applies only when state laws relate to the price, route, or service of a motor carrier *with respect to the transportation of property. See Ours Garage*, 536 U.S. at 429 (noting that the FAAAA preempts state regulation "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property") (ellipses in original); *id.* at 449 (Scalia, J., dissenting) (observing that the modifying clause "with respect to the transportation of property" serves to "massively limit[] the scope of preemption"). The

statute defines "transportation" to include "services related to th[e] movement [of property], including . . . storage, handling, packing, unpacking, and interchange of . . . property." 49 U.S.C. § 13102(23). The inclusion in the preemption provision of the clause "with respect to the transportation of property" follows naturally from Congress's deregulatory objectives; the goal was not to indiscriminately remove businesses that happen to operate as motor carriers from the traditional oversight of states as independent sovereigns in our system, but to prevent state laws from targeting motor carriers as movers of property for special treatment as to their prices, routes, or services. *See Ours Garage*, 536 U.S. at 449 (Scalia, J., dissenting). The activities listed in the statute are incidental to the movement of property; it would hardly make sense to preempt only state laws respecting the movement of things in commerce without also preempting state laws respecting other activities that are normally carried out in the course of transporting property (*e.g.*, storage and handling).

Applying the statutory text to the facts and legal claims at issue, we conclude that the plaintiff's claims survive under the plain terms of § 14501(c)(1). We note that the defendant has not identified with any clarity which provisions of RSA chapter 262 it believes are preempted. Without the benefit of moderately developed arguments containing specific reasons why individual provisions of that chapter should be preempted, we are not inclined to invalidate the entire chapter so far as it applies to towing companies. *Cf. Independent Towers, WA v. State, Washington*, 350 F.3d 925, 930 (9th Cir. 2003) ("Absent argument, we decline to pick through the many detailed sections and subsections in an effort to match the statutes and regulations with a preemption theory not articulated to us."). We thus confine our analysis to the provisions cited in the parties' briefs.

RSA chapter 262 prescribes the process by which a towing company may recover vehicle towing and storage costs. RSA 262:32 (2004 & Supp. 2011) authorizes removal and storage of vehicles under delineated circumstances including when vehicles have been stolen, abandoned, or appear unsafe to be driven. The next provision, RSA 262:33 (2004 & Supp. 2011), permits the towing company to place a lien on the vehicle for reasonable towing and storage charges, *see* RSA 262:33, I, and provides that the owner of the vehicle is entitled to recover the vehicle and a release of the lien upon payment of those charges, *see* RSA 262:33, II. If a vehicle is not claimed within thirty days after removal, the storage company may sell the vehicle at a public auction pursuant to RSA 262:36-a, :37 (2004 & Supp. 2011). In order to conduct an auction, however, RSA 262:38 (2004) requires the custodian to provide notice in "2 or more public places in the town or city where the property is stored, at least 14 days before the sale and, if the value of the vehicle exceeds $100, by publishing the notice at least once in

a newspaper of general circulation in the area."[2] The proceeds of the sale, after accounting for the amount of the liens and expenses incidental to the sale, must be distributed to the vehicle's owner. RSA 262:39 (2004).

■ The provisions of RSA chapter 262 are not state laws "with respect to the transportation of property"; they are state laws with respect to the collection of debts. When a towing company seeks to recover the costs incurred from towing and storing a vehicle, the manner in which it does so is not incidental to the *movement* of property by a motor carrier. Rather, it is incidental to the rights of property owners to recover their property, and the parallel obligations of the custodians of that property to accommodate the vehicle owners' rights — *i.e.*, by providing notice and holding a public auction, and not engaging in deceptive conduct or acting negligently. Reading § 14501(c)(1) differently would unduly strain its plain terms and render the language "with respect to the transportation of property" meaningless. *Cf. State v. Pierce*, 152 N.H. 790, 791 (2005) ("All words of a statute are to be given effect, and the legislature is presumed not to use words that are superfluous or redundant."); *Appeal of Barry*, 142 N.H. 284, 287 (1997) (we will not interpret a statute so as to render its language meaningless). Furthermore, we can discern no reason why preempting state-based claims against towing companies arising out of their efforts to dispose of unclaimed vehicles promotes the deregulatory objective of § 14501(c)(1), nor a "clear and manifest purpose" in the FAAAA to displace private remedies against tow truck companies for conduct wholly unrelated to the transportation of property.

■ ■ This reasoning applies with equal force to the plaintiff's common law negligence and Consumer Protection Act claims because they, too, arise out of the defendant's conduct in disposing of the plaintiff's vehicle. The plaintiff's negligence claim contends that the defendant violated its duty as a bailee to take reasonable care of the property in its custody and ensure its return to the bailor. Similarly, the CPA claim alleges that, by misrepresenting the status of the plaintiff's vehicle in response to his counsel's inquiry and disposing of the vehicle by trading it instead of taking adequate measures to ensure its return to the plaintiff, the defendant committed an "unfair or deceptive act or practice in the conduct of any trade or commerce." RSA 358-A:2 (2009). Those claims have nothing to do with the *transportation* of property; they involve the balance of rights between a lien creditor, who is entitled to recover the value of the debt, and the owner

---

[2] Notice by publication is not required, however, if the vehicle is more than five years old at the time of removal. RSA 262:36-a, I. The plaintiff's car was less than five years old when it was towed.

of a towed vehicle, who is entitled to recover either the vehicle after paying the appropriate costs or the remainder of the vehicle's value once the creditor has sold it in accordance with the terms of RSA chapter 262. As with the plaintiff's claims under RSA chapter 262, allowing these two claims to proceed against the defendant does not "significantly impact" Congress's deregulatory objectives or impose upon the trucking industry a patchwork of different standards relating to price, route, or service. Common-law torts like negligence establish baseline rules of acceptable conduct common to all. *See American Airlines, Inc. v. Wolens*, 513 U.S. 219, 236-37 (1995) (Stevens, J., concurring in part and dissenting in part) ("[T]he standard of ordinary care is a general background rule against which all individuals order their affairs."). Furthermore, the Consumer Protection Act does not significantly affect Congress's goals under the facts of this case because it governs the manner in which a company in possession of a towed vehicle may dispose of the vehicle to collect on a debt created by operation of state law — a regulatory subject far removed from Congress's aim of promoting free markets and equalizing the competitive playing field between motor carriers and air carriers. *Cf. Cole v. City of Dallas*, 314 F.3d 730, 734 (5th Cir. 2002) ("Congress intended to divorce the motor carrier industry from state and local economic regulation in order to provide motor carriers . . . the same competitive advantages enjoyed by air carriers . . . ."); *see* H.R. Conf. Rep. No. 103-677, at 85, 87 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1757, 1759.

B

■ Even assuming the plaintiff's claims rest on state laws "with respect to the transportation of property," another statutory ground supports the conclusion that § 14501(c)(1) does not preempt them. The state laws upon which the plaintiff relies in his writ — including the notice and auction requirements of RSA chapter 262, common law negligence, and the Consumer Protection Act — are, at least as they apply to the defendant's allegedly wrongful actions in disposing of the plaintiff's vehicle to recover its storage and towing costs, not sufficiently related to a towing company's "service" to be preempted under § 14501(c)(1). *Cf. Morales*, 504 U.S. at 390. Although the ordinary meaning of the phrase "relating to" is a broad one, it is not so broad as to encompass all possible private civil claims against any motor carrier.

■ To begin with, the provisions of RSA chapter 262 — requiring towing companies to attempt to identify the owner of a towed vehicle, make reasonable efforts to secure its return to the owner, and comply with the statute's notice and auction-related provisions — are too remotely related to a motor carrier's service. The "service" of a towing company is the

moving of vehicles. For consensual towing, the company moves a vehicle from one place to another; for nonconsensual towing, the company removes a vehicle from a place where it does not belong. *Cf. Charas*, 160 F.3d at 1265-66 (" '[S]ervice' . . . refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided. . . . To interpret 'service' more broadly is to ignore the context of its use; and, it effectively would result in the preemption of virtually everything an airline does."); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (defining service more broadly than in *Charas* but also holding negligence claim against airline not preempted). The manner in which a towing company may auction another person's property to collect on a debt relates to post-service debt collection — an area of the company's affairs falling well outside its service of towing vehicles. This conclusion has additional force in this case because the defendant has sought the benefit of state law allowing it to claim a lien on a vehicle in its possession, *see* RSA 262:33, I, but now seeks to avoid the inconvenience of providing adequate notice and conducting an auction as required by state law. Notwithstanding that RSA chapter 262 may affect the towing company's general "service" indirectly by imposing time and notice constraints on debt collection, those constraints do not bear the requisite nexus to the business of towing of vehicles to overcome the presumption that Congress does not intend to displace laws operating in a field of traditional state authority. *Cf. Wolens*, 513 U.S. at 237 n.2 (Stevens, J., concurring in part and dissenting in part) ("Indeed, every judgment against an airline will have some effect on rates, routes, or services, at least at the margin.").

 Similarly unavailing is the defendant's argument that the plaintiff's common law negligence claim, based upon the towing company's duty as a bailee, relates to the towing company's service. As the defendant recognizes, many courts have concluded that personal injury tort claims are not preempted under § 14501(c)(1) or its mirror provision applying to air carriers notwithstanding that tort claims may relate in some peripheral way to a motor carrier's "service." The Ninth Circuit Court of Appeals, for example, allowed such claims to proceed in *Charas*. That case called on the court to decide whether the Airline Deregulation Act preempted personal injury claims against an airline resulting from an accident involving a beverage cart which caused the dislocation of a passenger's shoulder, and other similar claims. The court concluded that it did not, reasoning that the "service" of an airline does not refer to "the pushing of beverage carts, keeping the aisles clear of stumbling blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions." *Charas*, 160

F.3d at 1266. Other courts have similarly held certain personal injury and other tort claims not preempted because they are too tangentially related to the service of an air or motor carrier. *See, e.g., Smith v. Comair*, 134 F.3d 254 (4th Cir. 1998) (state law claim against airline for false imprisonment and intentional infliction of emotional distress not preempted because they are too tenuously related to airline's services); *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 194 (3d Cir. 1998); *Somes v. United Airlines, Inc.*, 33 F. Supp. 2d 78, 83 (D. Mass. 1999); *Sedigh v. Delta Airlines, Inc.*, 850 F. Supp. 197, 200 (E.D.N.Y. 1994); *Paredes v. Air-Serv Corp., Inc.*, 251 P.3d 1239, 1248 (Colo. App. 2010); *cf. Continental Airlines Inc. v. Kiefer*, 920 S.W.2d 274, 282-83 (Tex. 1996) (reasoning that negligence claims relate to airline service but are policy-neutral and therefore not preempted); *Kuehne v. United Parcel Service*, 868 N.E.2d 870, 876 (Ind. Ct. App. 2007) (reasoning that, unlike negligence claims against motor carrier involving delivery process *before* a parcel reaches its destination, a negligence claim based on negligent *delivery* does not relate to service).

The reasoning of those cases holding personal injury and other tort claims not preempted applies with equal force to tort claims arising from the deprivation of the use of one's property, as long as the application of those tort principles remains only tangentially related to a motor or air carrier's services. To the extent that the plaintiff in this case has alleged an injury to his property rather than his person, we find little material difference between the two. Had the errant beverage cart in *Charas* ripped a hole in the passenger's luggage instead of dislocating his shoulder, his ensuing negligence claim would bear no greater relation to the airline's service than the claims asserted here. Not only do the plaintiff's negligence claims themselves bear only a remote connection to the defendant's "service," but they also arise out of the defendant's act of *disposing* of the vehicle — not *towing* it.

The same reasoning applies to the plaintiff's Consumer Protection Act claim, *see* RSA 358-A:2 (2009), because, as alleged here, it arises out of the obligation to not act unfairly or deceptively in disposing of — not transporting — a vehicle under the care of a towing company. Unlike in *Morales*, where the Supreme Court decided that the state law guidelines could not be imposed upon airline advertising, here the CPA claims are asserted against a towing company based not upon its role as an entity that tows vehicles (or the price, route, or service relating to that role), but upon its role as a custodian of another person's property after the towing has been completed. The state's substantive requirement to refrain from unfair or deceptive practices in that role has little to do with a towing company's service of removing vehicles from where they are not permitted to be.

We note, finally, that the absence of any federal remedy for private injuries of the kind allegedly suffered by the plaintiff also supports the inference that Congress did not intend to displace the operation of state laws in this context. *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984) (observing that "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct"); *Kuehne*, 868 N.E.2d at 877-78; *Margolis v. United Airlines, Inc.*, 811 F. Supp. 318, 324-25 (E.D. Mich. 1993). This is not a situation in which a plaintiff has sought to enforce state laws and regulations affecting the everyday operation of a towing company in its capacity as a mover of property. Fairly read, the theories upon which the plaintiff's claims rest advance the right of a person whose vehicle has been towed to retrieve it upon payment of the towing and storage costs. Although the lack of a parallel federal remedy for tortious or otherwise unlawful conduct by towing companies in the management and disposition of towed vehicles does not *require* the conclusion that Congress did not intend preemption in this context, *cf. Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 203 (1978) (noting that "[t]o allow the exercise of state jurisdiction in certain contexts might create a significant risk of misinterpretation of federal law and the consequent prohibition of protected conduct" but holding that National Labor Relations Act does *not* preempt state enforcement of laws prohibiting violence, defamation, and intentional infliction of emotional distress), it does militate strongly against reading § 14501(c)(1) so expansively as to encompass everything a towing company might do in the course of its business, as we read the defendant's brief to assert. *Cf. Charas*, 160 F.3d at 1266.

We part ways with the Alabama Supreme Court's decision in *Weatherspoon*, 44 So. 3d 447, which reasoned that "the failure of Congress to provide an alternative remedy upon preemption is [no] basis for finding that [the plaintiff's] claims are not preempted." *Id.* at 457 n.4. While it is true that the absence of a remedy *alone* is no bar to preemption if Congress has manifested a clear intention to immunize certain activities from state law causes of action, *see, e.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 584 (1981), the United States Supreme Court has made clear that the absence of a remedy is relevant to understanding the intended scope of a federal statute's express preemption provision. *See Silkwood*, 464 U.S. at 251; *United Constr. Workers v. Laburnum Constr. Corp.*, 347 U.S. 656, 663-64 (1954) (expressing concern that a finding of preemption would effectively grant union "immunity from liability for their tortious conduct"); *see also Taj Mahal*, 164 F.3d at 194 ("It is highly unlikely that Congress intended to deprive passengers of their common law rights to recover for death or personal injuries sustained in air crashes."). The lack of a remedy

is particularly strong evidence that Congress did not intend such a broad scope of preemption in light of the presumption that Congress does not "cavalierly" displace state laws in an area of traditional state authority. As the Supreme Court stated in *Ours Garage*, 536 U.S. at 432, 439, Congress's purpose behind § 14501(c)(1) was to preempt states' economic authority over motor carriers of property, not to supersede the traditional state police power absent a "clear and manifest" intention to do so.

*IV. Conclusion*

For the reasons stated above, we conclude that the plaintiff's action for wrongful disposition of his vehicle under state law is not preempted under 49 U.S.C. § 14501(c)(1).

*Reversed and remanded.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.